# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| **DYMATIZE ENTERPRISES INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-0046-O-BH |
| | § | (Consolidated with 3:09-CV-1719-O-BH) |
| | § | |
| **MAXIMUM HUMAN PERFORMANCE, INC.,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the District Court's *Order Referring Motions*, filed August 6, 2010, *Dymatize Enterprises, Inc.'s and Michael Casid's Motion to Dismiss with Prejudice and Brief in Support Thereof* (doc. 111), filed July 27, 2010, and *Maximum Human Performance, Inc.'s Motion to Enforce the Settlement Actually Agreed to by the Parties and Brief in Support* (doc. 113), filed August 6, 2010, have been referred for hearing, if necessary, and determination or recommendation. Based on the relevant filings, evidence, and applicable law, both motions should be **DENIED**.

## I. BACKGROUND

On January 9, 2009, Dymatize Enterprises Inc. ("Dymatize") filed Civil Action No. 3:09-CV-0046 in this district against Maximum Human Performance Inc. ("MHP"). Dymatize sought a declaratory judgment that its advertising statements for its Elite 12 product did not constitute false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). A week later, on January 16, 2009, MHP filed suit against Dymatize and Michael Casid in the District of New Jersey, but the case was subsequently transferred to this Court and opened as Civil Action No. 3:09-CV-1719. MHP alleged that Dymatize made false advertising statements that its Elite-12 product could provide extended release of proteins for up to twelve hours, and asserted claims for false advertising and

unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), violation of the New Jersey Fair Trade Act, N.J.S.A. § 56:4-1, and common law unfair competition. With the consent of the parties, the Court consolidated the two cases and ordered that the complaint in Civil Action No. 3:09-CV-1719 be considered a counterclaim against Dymatize and Casid in this action. Dymatize then amended its complaint to include six antitrust causes of action for monopolization and restraint of trade against MHP, and moved for summary judgment seeking dismissal of all of MHP's claims. On June 24, 2010, the Court recommended denial of Dymatize's motion for summary judgment.

On July 14, 2010, through an email exchange, the parties agreed that (1) Dymatize could not "sell or distribute any product under the Elite 12 mark" after September 30, 2010; (2) all litigation in the Northern District of Texas and other courts would be dismissed with prejudice, with parties bearing their own costs and attorneys' fees; (3) Dymatize would be paid $100,000 upon dismissal of the action, and another $100,000 on September 30, 2010, and (4) the stipulation of dismissal would contain a term that the Northern District of Texas would retain limited jurisdiction in Civil Action No. 3:09-CV-0046 to enforce the settlement agreement if needed. (P. App. 6.) On July 15, 2010, MHP's attorney signed a copy of the e-mail exchange (*id.*), and the parties jointly filed a notice of settlement with the Court advising that they were in the process of drafting the settlement agreement. (doc. 108). The parties proposed, and the Court directed them, to file a stipulation of dismissal under Fed. R. Civ. P. 41(a)(1)(A) on or before July 27, 2010. (docs. 108 & 109.)

On July 20, 2010, Dymatize e-mailed MHP a draft settlement agreement containing the agreed terms. (P. App. 2, 11-18.) The next day MHP e-mailed Dymatize a draft of what it called "a more comprehensive agreement." (P. App. 2, 19, 22-35.) Among other things, MHP's draft agreement permanently prohibited Dymatize "from selling manufacturing and distributing, directly or indirectly, any products now existing or hereafter developed under the name or trademark Elite

2

12, or any confusingly similar name or mark that contains any numerical reference," and "from advertising, distributing, marketing or selling any protein products that claim, directly or indirectly, a durational release period of any protein or proteins exceeding six (6) hours, regardless of the product name or trademark." (P. App. 26-27). Dymatize objected to MHP's draft agreement as "totally inconsistent with the parties' agreement," and emailed an edited version of the draft back to MHP. (P. App. 2-3, 38, 43-61.)

On July 26, 2010, MHP e-mailed a revised version of the agreement for the parties to execute. (P. App. at 3, 63-73.) Among other things, the draft agreement permanently prohibited Dymatize "from selling, distributing, advertising and marketing any products now existing or hereafter developed under the name or trademark Elite 12 or any confusingly similar name or mark," and "from selling, distributing, advertising and/or marketing any extended release products with a quantified hour or time duration beyond nine (9) hours unless the Dymatize parties have a technology and/or coating to support such extended release proteins." (P. App. at 66.) MHP also e-mailed dismissal papers to Dymatize. (P. App. at 4, 74-88.) Dymatize responded that it had no objection to the dismissal papers and intended to file them the next morning. (P. App. 4, 89.) On July 27, 2010, MHP objected that Dymatize had no authority to file the dismissal papers unless Dymatize executed the revised document. (P. App. 89-92.) That same day the parties conferred but failed to resolve the dispute.

Dymatize and Casid then moved to dismiss this litigation with prejudice under the terms of the settlement agreement, and requested that they be reimbursed for attorney's fees incurred due to MHP's refusal to comply with the terms of the settlement. MHP in turn moved to enforce what it calls "the settlement actually agreed to by the parties", which allegedly required Dymatize to exit the extended 12-hour protein market rather than merely stop using the name Elite 12 in selling its

3

protein products. MHP sought to compel Dymatize to execute a more comprehensive settlement agreement memorializing their alleged agreement that Dymatize will exit the extended 12-hour protein market on September 30, 2010, and containing what it considered to be other reasonable and customary boilerplate terms.

By their motions, both parties essentially seek to enforce their respective versions of the settlement agreement. Primarily at issue is whether Dymatize agreed to exit the extended protein release market or merely agreed to stop using the Elite 12 mark in the sale and distribution of its products.

## II. ANALYSIS

A settlement agreement touching a pending suit is enforceable under Texas law only if it is in writing, signed, and filed as part of the record. *Estate of Martineau v. ARCO Chemical Co.*, 203 F.3d 904, 910 (5th Cir. 2000) (citing Tex. R. Civ. P. 11).[1] To be enforceable, the agreement must not only contain all material terms, *see id.* (citing *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex.1995)), but the terms must be "sufficiently definite to enable the court to understand the parties' obligations." *See Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 323 (5th Cir. 2006) (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831 (Tex.2000)). "Evidence of the parties' intent to enter into a binding agreement is also required." *Id.* (citing *Premier Oil Refining Co. v. Bates*, 367 S.W.2d 904, 907 (Tex. App.1963)).

Here, the parties agreed to all the material terms of the settlement through an email exchange on July 14 and 15, 2010. The email exchange contained very specific and definite terms that Dymatize would not "sell or distribute any product under the Elite 12 mark" after September 30,

---

[1] The parties appear to agree that Texas law applies to the issues presented; they cite to Texas law and Fifth Circuit cases applying Texas law.

4

2010; that all litigation in the Northern District of Texas and other courts would be dismissed with prejudice, with parties bearing their own costs and attorneys' fees; that Dymatize would be paid $100,000 upon dismissal of the action, and another $100,000 on September 30, 2010; and that the stipulation of dismissal would contain a term that the Northern District of Texas retained limited jurisdiction in Civil Action No. 3:09-CV-0046 to enforce the settlement agreement if needed. The next day, MHP's attorney confirmed MHP's acceptance by signing a copy of the email exchange containing these very specific and definite terms. A copy of the signed email exchange is on file with the Court.

MHP now seeks to compel Dymatize to memorialize more comprehensive settlement terms on grounds that the email exchange on July 14 and 15 lacked a merger or integration clause. It contends that the parties' intent throughout their settlement discussions was for Dymatize to exit the extended protein release market; it not only understood the July 14 email exchange to embody that intent but was satisfied that a later more comprehensive settlement agreement would reflect that intent. MHP also argues that Dymatize's interpretation of the settlement terms is implausible given that the goal of this litigation was not a mere name change but to force Dymatize out of the extended protein release market because of its false and unsupported extended release claims.

A court construes a "settlement agreement according to the rules applicable to contract interpretation." *Alamo Cmty. Coll. Dist. v. Miller*, 274 S.W.3d 779, 783 (Tex.App.–San Antonio 2008, no pet.). "In construing a written contract, the primary concern of the court is to ascertain and give effect to the parties' intentions as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003). If the contract can be given a definite or certain legal meaning, it is unambiguous as a matter of law. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). If the contract is susceptible to more than one reasonable

5

interpretation, the contract is ambiguous, therefore giving rise to a question of fact. *Id.* "Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract." *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 926 S.W.2d 280, 283 (Tex. 1996).

In this case, the term at issue unambiguously states that Dymatize cannot "sell or distribute any product under the Elite 12 mark." The term is definite and certain and is susceptible to only one reasonable interpretation given the fact that the false advertising and unfair competition claims in this litigation revolve around Elite 12. MHP's argument that Dymatize agreed to exit the extended release market is not an alternative reasonable interpretation, but rather, a modification of that term. Since the contract is unambiguous as a matter of law, MHP may not create an ambiguity by going out of the four corners of the document and presenting extrinsic evidence. *See Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir.2006) (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732-33 (Tex.1982)). The "ambiguity must become evident when the contract is read in the context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995).

Additionally, the Court need not compel the parties to memorialize a more comprehensive agreement embodying any settlement discussions on Dymatize's exit from the extended release market. Under Texas law, when parties conclude a valid integrated agreement with respect to a particular subject matter, the parol evidence rule "precludes the enforcement of inconsistent prior or contemporaneous agreements." *Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990) (citing *Hubacek v, Ennis State Bank*, 317 S.W.2d 30 (Tex. 1950). It is well settled that a written agreement is presumptively integrated. *See id.* (citation omitted). When the parties reduce their agreement to writing they are "presumed to have selected from prior negotiations only

the promises and agreements for which they choose to be bound." *See id.* Only when a writing is facially incomplete is parol evidence admissible to clarify, explain, or give meaning to a writing, or to show collateral agreements. *See id.* at 174-75. Even then, the evidence is not admissible to vary or contradict a complete and unambiguous term of an otherwise incomplete writing. Here, the agreement is not only written, but is complete, definite, and certain in that it restricted Dymatize from using only the Elite 12 mark in the sale or distribution of its products. Any assertion by MHP otherwise is inconsistent with that complete and definite term.

MHP contends that if the agreement only restricts Dymatize from using the Elite 12 mark, there is no "meeting of the minds" required to enforce the agreement, and the case should be reinstated on the active trial calendar. A meeting of the minds is essential to any contract under Texas law, but it may only be discerned by looking in an objective fashion at what the parties actually said and did, and not by considering their subjective intent. *Gray Law LLP v. Transcontinental Ins. Co.*, 560 F.3d 361, 365-66 (5th Cir. 2009) (citing *Sonne v. FDIC*, 881 S.W.2d 789 (Tex.App.-Houston 1994, rehearing denied); *Choctaw Props., LLC, v. Aledo ISD*, 127 S.W.3d 235, 245-46 (Tex. App–Waco 2003, no pet.)). The email correspondence between the parties on July 14 and 15, even if considered in conjunction with any contrary settlement discussions, shows that the parties reached a negotiated agreement on very specific and definite terms set out in the email exchange. The parties therefore clearly achieved a meeting of the minds on those terms.

The parties also agreed to execute a formal agreement. Dymatize's email to MHP on July 15, 2010, anticipates a formal settlement agreement, and its conduct following that email evinces an agreement between the parties to execute a more formal settlement agreement. (*See* P. App. at 6.) Additionally, the parties filed a joint notice of settlement notifying the Court that the parties were in the process of drafting a formal settlement agreement. (*See* doc. 108.)

7

In conclusion, the settlement agreement, as embodied in the email exchange, is valid and enforceable. The parties also agreed in writing to execute a formal agreement before filing a stipulation of dismissal. Dymatize's motion to dismiss this action prior to executing a formal agreement with MHP should be **DENIED**. MHP's motion to force Dymatize to execute a formal agreement containing terms that were not part of the agreement should also be **DENIED**. The parties should bear their own costs and attorney's fees for their motions.[2]

### III.  CONCLUSION

*Dymatize Enterprises, Inc.'s and Michael Casid's Motion to Dismiss* and *Maximum Human Performance, Inc.'s Motion to Enforce the Settlement Actually Agreed to by the Parties* should both be **DENIED**. The parties should be ordered to proceed in good faith to execute a settlement agreement and to file a stipulation of dismissal with the Court within thirty days of the order accepting this recommendation.

**SO RECOMMENDED** on this 20th day of September, 2010.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[2] A court may assess attorney's fees where a party acts in bad faith, vexatiously, wantonly, and for oppressive reasons. *See Okwilagwe v. Atrium Cos., Inc.*, No. 3:04-CV-2425-L 2005 U.S. Dist. LEXIS 15134, *4-*5 (July 22, 2005) (Kaplan M.J.) (citing *Chambers v. NASCO Inc.*, 501 U.S. 32, 45-46 (1991). Neither side has shown that the other side engaged in such conduct.

**INSTRUCTIONS FOR SERVICE AND
<u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE